Filed 3/6/13  In re A.C. CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re A.C., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B242014 (Super. Ct. No. J065689) (Ventura County) |
| VENTURA COUNTY HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>C.W. et al.,<br><br>    Defendants and Appellants. | |

Parents appeal an order terminating parental rights and designating adoption as the permanent plan.  (Welf. & Inst. Code, § 366.26.)[1]  We affirm.

## FACTS

Chantel W. (Mother) and Terry C. (Father) are the parents of A.C.[2]  Mother has a long history with the HSA.  Her parental rights to four other children had been terminated.

---

[1] All statutory references are to the Welfare and Institutions Code.

[2] The trial court also terminated Father's parental rights.  Father does not contest the termination of his rights.  He filed a brief, however, joining Mother in contesting the termination of her rights.  For convenience, we refer to both parents collectively as Mother.

A.C. was born in 2004. Based on the previous terminations of parental rights, HSA brought a dependency action for A.C. Mother complied with the service plan, and the dependency action was terminated in 2005.

On March 21, 2010, five-year-old A.C. awoke to find Mother was not home. Frightened, she called 911 and reported Mother missing. When a police officer arrived, he searched the apartment and found no one else there.

At about 9:00 a.m., police officers saw Mother and a male companion, Father, walking up the stairs to her apartment. The officers detained Father. Father said that Mother had picked him up in her car at about 4:00 a.m. They went to a friend's house, drank alcohol and played cards.

One of the officers heard Mother berating A.C. for calling 911. The officer reassured A.C. that she had done the right thing.

Mother told the police that she had been in the garage the entire time, and that A.C.'s adult half-brother, C., had been in the apartment with A.C. The police told Mother she was lying. They had searched the area and had found no one. Mother became argumentative. The police arrested Mother and Father for being under the influence of a controlled substance. Mother tested positive for cocaine.

HSA took A.C. into protective custody and filed a section 300 petition on March 23, 2010. The juvenile court temporarily removed A.C. from parental custody.

Initially, HSA recommended that reunification services not be provided. The recommendation was based on Mother's prior history with HSA and her extensive history of criminal convictions. Ultimately, however, HSA changed its recommendation because A.C. was so well behaved. The court ordered reunification services. The court set an interim review for August 2010 and a six-month review for November 2010.

At the interim review, HSA reported that Mother was progressing slowly. She dropped out of an outpatient drug treatment program and had just recently enrolled in another program. Her counselor expressed concern about her ability to benefit from treatment because she minimized the factors that led to her dependency. She was not

2

participating in anger management or parenting education. The urine sample for a random drug test was diluted and positive for alcohol.

At the six-month review on November 8, 2010, HSA reported that Mother continues to visit with A.C. consistently and regularly speaks with her on the telephone. Mother is "loving and appropriate" with A.C. A.C. enthusiastically looks forward to the visits. Mother and A.C. have a significant bond that benefits the child's continued "emotional development and best interest."

Mother participated in counseling sessions, but failed to disclose her history of substance abuse and domestic violence. She refused to sign a release that would permit HSA to discuss her services. She was not in a domestic violence or anger management class. She was, however, generally compliant with random drug tests. The court continued reunification services and set a 12-month review for April 2011.

At the April 2011 hearing, HSA reported Mother completed parenting classes and, after resisting, ultimately attended anger management classes. She did well on her drug tests, but missed a test in February. She gave inconsistent explanations for missing the test.

Matters took a turn for the worse in January 2011. Mother lost her apartment. HSA arranged for her to enter the Lighthouse Program where she could have overnight visits with A.C. Mother lied about a required tuberculosis test, refused to observe the rules limiting the use of her car, and left the program after a week. Thereafter, Mother's visits with A.C. took place at HSA's office. She continued to have a positive relationship with A.C.

After Mother left the Lighthouse Program, she became evasive about where she was living and what she was doing with her time. On February 21, 2011, Mother was staying with her sister, A.D. Mother often fights with the father of A.D.'s daughters when he is in their home. One of the daughters reported that Mother drinks at times in their home. One night, when Mother had been drinking, she got into a fight with her sister's boyfriend and threatened him with a knife.

3

Mother would neither confirm nor deny that she had been drinking at the time of the domestic violence. She also denied she had an anger problem.

Mother told a social worker that she had been attending 12-step meetings, and that her sponsor was named, "Lana." When contacted, Lana denied she had ever been Mother's sponsor. Mother admitted she lied.

The trial court expressed doubt about HSA's recommendation that services to Mother be continued. But the court accepted HSA's recommendation because Mother's relationship with A.C. was good. The court set a review for October 11, 2012. The report for the October 11, 2012 hearing recommended a termination of reunification services and that the court set a section 366.26 hearing for a plan of adoption.

HSA reported that Mother missed about one-third of her random drug tests. She had a different excuse for each missed test. She also failed to respond to telephone calls from HSA requiring her to participate in "on demand" drug tests.

Mother failed to attend a 12-step program for at least three months. She told a social worker her sponsor was Mary. When the social worker called the number Mother gave her, no one at the location had heard of Mary.

HSA referred Mother to a number of housing programs. When she obtained housing in a program that would have allowed A.C. to live with her, she was discharged from the program for failure to follow the program's rules and policies. Mother was also evasive when HSA questioned her about applying for employment.

A.C. told a social worker that she blamed herself for being in foster care because she called the police on Mother. Mother told A.C. that A.C. was to blame.

The trial court found that Mother had not followed her case plan and terminated reunification services. The court set a section 366.26 hearing for March 26, 2012.

At the section 366.26 hearing, HSA recommended that the court terminate parental rights and implement a permanent plan for adoption. HSA reported that A.C.'s paternal aunt is interested in adopting her. The aunt lives in Texas. Texas authorities will not conduct a home study until the court terminates parental rights. HSA's

4

assessment of the aunt concluded, however, that there is reason to believe the adoption would be successful. If the aunt cannot adopt A.C., her foster parents would like to adopt her.

Mother claimed that termination of her parental rights would be detrimental to A.C. Mother testified she had an excellent relationship with A.C. and they have a very close bond. She pointed out that she attended every scheduled visit with A.C. except two. Mother, with the permission of HSA, was involved in A.C.'s school activities.

A.C. told a social worker that she wanted to live with her aunt but she also wanted to maintain contact with Mother, siblings and foster family. A.C. said it would be okay to live with her foster parents, too. The social worker recommended that if A.C. is placed with her aunt, Mother could arrange for visits. But if A.C. is adopted by her foster parents, the visits should be discontinued.

An HSA report described the quality of Mother's visits with A.C. as "acceptable to detrimental for the child." Mother argued with the case aid about visitation rules.

*Sibling Relationships*

A.C. has two adult half-siblings, C. and B. Both siblings had been subject to prior dependency proceedings.

C. lived with A.C. until the dependency proceedings when A.C. was five years old. During the dependency proceedings, C. had only one telephone call and two visits with A.C.

B. saw A.C. mainly at church or other functions in the first year of her dependency. In the second year of A.C.'s dependency, B. did not contact her at all. B. said she wanted A.C. placed with her in six months to a year. The social worker did not believe this was a viable option due to the very high demand on B.'s time, resources and educational goals.

HSA reported B.'s and C.'s contacts with A.C. had been minimal, and do not support the conclusion that a substantial relationship exists between A.C. and her siblings.

5

The trial court terminated parental rights and designated adoption as the permanent plan.

I.

Mother contends she satisfied her burden of proof to show that termination of her parental rights will be detrimental to A.C.

Adoption, where possible, is the permanent plan preferred by the Legislature. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.) The Legislature has provided an exception to adoption as the permanent plan where the court finds termination of parental rights would be detrimental to the child because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) In order to qualify for the exception, a parent must show that the beneficial relationship with the child "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.*, *supra*, at p. 575.)

Mother claims courts have used two different standards of review. Historically, courts have applied the substantial evidence standard. (Citing *In re Autumn H.*, *supra*, 27 Cal.App.4th at pp. 575-576.) Recently, *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315, applied the substantial evidence standard to the trial court's determination whether a beneficial relationship exists, and the abuse of discretion standard to the court's determination whether the relationship is so important that it compels a plan other than adoption. Here we affirm under either standard.

Mother concedes she bears the burden of proving the exception to adoption applies.

"In viewing the evidence, we look only to the evidence supporting the prevailing party. [Citation.] We discard evidence unfavorable to the prevailing party as not having sufficient verity to be accepted by the trier of fact. [Citation.] Where the trial court or jury has drawn reasonable inferences from the evidence, we have no power to

6

draw different inferences, even though different inferences may also be reasonable. [Citation.] The trier of fact is not required to believe even uncontradicted testimony. [Citation.]" (*Rodney F. v. Karen M.* (1998) 61 Cal.App.4th 233, 241.)

Here the evidence shows Mother left A.C. alone in her apartment and returned under the influence of a controlled substance; blamed A.C. for calling the police; became homeless; refused to cooperate with HSA in finding suitable housing where A.C. could visit overnight; abused alcohol; threatened her sister's boyfriend with a knife; missed numerous drug tests; and lied to HSA about obtaining a 12-step sponsor. In short, the evidence shows Mother is unwilling or unable to provide a stable home for her daughter. Assuming A.C. had a beneficial relationship with Mother, the benefit of that relationship falls far short of the benefits A.C. would obtain in a stable home with adoptive parents.

II.

Mother contends she satisfied her burden of proving termination of her parental rights would be detrimental to A.C. based on her sibling relationships.

Section 366.26, subdivision (c)(1)(B)(v) provides an exception to adoption as the permanent plan where the court finds termination of parental rights would be detrimental to the child because "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption."

Here contact between A.C. and her siblings had been minimal during the two years of her dependency. C. called her once and visited her twice. B. initially saw A.C. at church and other functions, but had no contact with her during the second year of the dependency.

7

Mother simply failed to carry her burden of proving the relationship between A.C. and her siblings was so substantial that it outweighs the benefits of adoption.

Mother asserts there is no assurance that A.C.'s aunt will be able to adopt her. If A.C.'s foster parents adopt her, Mother and A.C.'s siblings may lose all contact with her. But even if A.C. looses all contact with her mother and siblings, the detriment will not outweigh the benefits of adoption.

III.

Mother contends the trial court failed to comply with the Indian Child Welfare Act (ICWA; 25 U.S.C. § 1901 et seq.)

ICWA requires that where a court knows or has reason to know that a Native American child is involved, the party seeking termination of parental rights must notify the child's tribe of the pending proceedings and its right to intervene. (*In re Desiree F.* (2000) 83 Cal.App.4th 460, 469.)

Here the record shows HSA complied with ICWA.[3] Members of A.C.'s family reported that A.C. may have Indian heritage, possibly with the Blackfeet Tribe. HSA sent notice on form ICWA-030 to the Blackfeet Tribe. The Tribe responded that A.C. is not an "'Indian Child'" as defined by ICWA. The trial court found ICWA does not apply.

It is true HSA did not send notice to the Blackfeet Tribe until after Mother raised the issue in her opening brief. But HSA may comply with the ICWA notice requirements while the appeal is pending. (*In re C.D.* (2003) 110 Cal.App.4th 214, 224-226.)

---

[3] We grant HSA's motion to supplement the record.

The judgment is affirmed.

NOT TO BE PUBLISHED.


GILBERT, P. J.


We concur:


YEGAN, J.


PERREN, J.

9

Ellen Gay Conroy, Judge

Superior Court County of Ventura
_____


Lori A. Fields, under appointment by the Court of Appeal, for Defendant and Appellant C.W.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant T.C.

Leroy Smith, Ventura County Counsel, Oliver G. Hess, Assistant County Counsel, for Plaintiff and Respondent.